IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


JOSEPH LEROY DAYRINGER,               )
Register No. 161097, and JAMES ERIC   )
MANSFIELD, Register No. 191434,       )
                                      )
                    Plaintiffs,       )
                                      )
            v.                        )          No. 08-4128-CV-C-MJW
                                      )
DAVID WEBSTER, et al.,                )
                                      )
                    Defendants.       )


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.  Introduction

Plaintiffs Joseph Lee Dayringer and James Eric Mansfield, inmates housed at the
Jefferson City Correctional Center (JCCC), and practitioners of the Christian Separatist Church
Society (CSCS) faith, allege that a Missouri Department of Corrections (MDOC) policy limiting
the amount of personal property an offender may possess, specifically, the six-book limit,
violates their rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),
42 U.S.C. § 2000.  RLUIPA prohibits the government from substantially burdening the exercise
of religion absent a compelling interest.  Plaintiffs also claim that defendant David Webster's
removal of contraband from their cells violated their right to religious exercise under the Free
Exercise Clause of the First Amendment and RLUIPA.  Plaintiffs claim the searches, issuance of
conduct violations, and lack of access to the items removed from their cells pending resolution of
the disciplinary and grievance processes were retaliatory in nature and imposed a substantial
burden on their religious exercise.  In addition, plaintiffs assert they were similarly situated to
Shane Smith, another inmate who identifies himself as a CSCS practitioner, but were treated
differently because Smith's books were returned to him at an earlier stage of the grievance
process.  Plaintiffs base their equal protection claims on the alleged difference in treatment of
Smith.  Finally, plaintiffs contend MDOC officials have instituted a system-wide practice of

violating inmates' rights to practice the CSCS faith, in violation of their constitutional rights. Plaintiffs seek declaratory relief.

The Court heard evidence during a bench trial that commenced on December 5 and concluded on December 8, 2011. Having fully considered all of the testimony, exhibits, and argument, the Court makes the following findings of fact and conclusions of law:

## II. Findings of Fact

1. Plaintiffs Joseph Dayringer and James Eric Mansfield are inmates in the custody of MDOC. Plaintiffs have been housed at JCCC since it opened in 2004. Plaintiffs have both been convicted of murder in the first degree and are serving sentences of life without parole.

2. Defendant Arthur Wood was an Associate Superintendent at JCCC from July 2002 to October 31, 2007, and a Deputy Warden at JCCC from November 1, 2007, until his retirement on January 31, 2009.

3. Defendant Bill Galloway worked for the Missouri Department of Corrections from August 4, 1980, until his retirement on August 31, 2011. He was Assistant Deputy Warden at the Missouri State Penitentiary and JCCC from August 2001 until his retirement.

4. Defendant David Webster worked for the Missouri Department of Corrections from December 13, 1982, until his retirement on July 31, 2011. He was a Corrections Caseworker at JCCC in 2007. In June 2008 defendant Webster was promoted to Functional Unit Manager.

5. In the spring of 2007, a letter from Jason Henry to plaintiff Mansfield was brought to defendant Webster's attention. Defendant Webster was concerned after reviewing the letter because he had previously received information that inmates were stealing from the Handicap Center. Defendant Webster requested to have plaintiff Mansfield's mail monitored.

6. On April 21, 2007, Pastor Vann Herrell, also a practitioner of the CSCS faith, signed a visiting application form sent to him by plaintiff Mansfield. Pastor Herrell marked the clergy/spiritual advisor box under the section "relationship to offender" and indicated he was on David Tate's visiting list as a clergy/spiritual advisor. Pastor Herrell also indicated that David Tate was at JCCC. (DX 9, p.3.)

2

7.  Inmate David Tate was assigned to Crossroads Correctional Center in 2007.  In April 2007, Pastor Herrell had been approved as a visitor to David Tate, but not as a clergy/spiritual advisor visitor.

8. Pastor Herrell's April 21, 2007 visiting application form is stamped received April 23, 2007.  (DX 9, p.3).

9.  Incoming visiting application forms are routed to the secretary for the offender's housing unit who date-stamps the forms.  If the clergy/spiritual advisor box is marked, the secretary sends the form to the Chaplain.

10.  In accordance with MDOC policy, an individual must complete a separate application form to obtain clergy/spiritual advisor visitation approval.  The rule requires proof of ordination, a clergy license, or other documentation of clergy status, and the applicant's standing with the religious group is required in addition to the information required for a regular visiting application.

11.  After Chaplain Joe Gibson verified that an applicant had satisfied the clergy/spiritual advisor visitation approval requirements, defendant Wood would sign off on the approval.

12.  On May 24, 2007, Pastor Herrell was approved as a clergy visitor to inmate David Tate.

13.  On May 29, 2007, Chaplain Gibson approved Pastor Herrell as a clergy visitor to Michael Murphy, an inmate at JCCC.  In response to Pastor Herrell's correspondence requesting to visit three inmates, Murphy, Smith and Mansfield, during one trip to JCCC, Chaplain Gibson informed Pastor Herrell by correspondence dated July 25, 2007, that, pursuant to written prison policy and the lack of approval by the Superintendent, he would only be permitted to visit inmate Murphy during his trip to JCCC.  (DX 7, 8.)

14.  Plaintiff Mansfield worked at the Braille Handicap Center at JCCC from March 2005 to April 2007.  The Handicap Center is a printing facility which produces materials, including books, in Braille and other formats for the Department of Social Services, Rehabilitation Services for the Blind.

15. In April 2007, plaintiff Mansfield supervised the Quality Control Department of the JCCC Handicap Center. The Quality Control Department checks for errors and formatting problems electronically.

16. Plaintiff Mansfield knows how to use the scanners at the Handicap Center.

17. Plaintiff Mansfield sent attorney Jason Henry a 104-page copy of the "Christian Separatist Catechism for the Anointed Nation" that was scanned and reformatted in Word. The table of contents was renumbered to match the altered format. (DX 13.)

18. Jason Henry acknowledged receipt of the scanned and reformatted copy of the "Christian Separatist Catechism for the Anointed Nation" from plaintiff Mansfield. Mr. Henry offered to reimburse plaintiff Mansfield for his "time and copy expenses" and asked plaintiff to send him a deposit form. (DX 12.) Between January 1, 2007, and August 31, 2009, Jason Henry did not deposit any money in plaintiff Mansfield's inmate account.

19. Inmates at JCCC were not allowed to possess items with plastic comb binding in their cells. Plastic binding can be altered to create homemade weapons.

20. Plastic comb binding is used to bind books at the JCCC Handicap Center.

21. Plaintiff Dayringer began working at the JCCC Handicap Center in July 2007. He was also trained to use a document scanner.

22. On July 18, 2007, at approximately 3:00 p.m., defendant Webster searched plaintiff Mansfield's cell. Defendant Webster found numerous books and pamphlets, including books with plastic binding. (PX 15.) Defendant Webster removed <u>The New Testament - Anointed Standard Translation (AST),</u> ten other books, and a brown legal folder that contained additional books, pamphlets, and five letters. (PX 8.)

23. On July 25, 2007, defendant Webster searched the cells of inmates Shane Smith and plaintiff Dayringer. Defendant Webster removed eight books from Shane Smith's cell. When defendant Webster searched plaintiff Dayringer's cell, he found nine books over the limit of six, one of which had plastic comb binding. (PX 9, 15 and 17.)

24. Plaintiffs did not present any evidence to support their claim that defendant Wood directed defendant Webster to investigate plaintiffs or remove personal property from their cells because of their religious beliefs. However, defendant Wood did authorize defendant Webster to

4

search plaintiffs' cells because of defendant Webster's suspicion and belief that plaintiffs may have had unauthorized contraband in their cells. Defendant Webster's testimony corroborated the testimony of defendant Wood regarding the purpose of the search.

25. On July 26, 2007, defendant Webster issued a conduct violation to plaintiff Mansfield for violating Rules 22.1 (taking property without consent), 24.1 (making, transferring or having possession of any unauthorized article), 24.4, and 41.2 (using any equipment, machinery or electronic device, including computers, without authorization, or in an unauthorized manner). (PX 15.)

26. On July 26, 2007, plaintiff Mansfield filed an Informal Resolution Request (IRR) with JCCC staff concerning the July 18, 2007 search of his cell. The submission of an IRR form by an inmate initiates the prison grievance process. (PX 10.)

27. Defendant Webster was not aware of IRR No. JCCC 07-1741 until he was asked to respond to its allegations in August 2007.

28. Corrections Classification Assistants provide IRR forms to offenders and receive completed IRR forms from offenders. Plaintiff Mansfield did not give IRR No. JCCC 07-1741 to defendant Webster.

29. On July 25, 2007, Chaplain Gibson responded to a letter from Vann Herrell requesting permission to visit inmate Michael Murphy, plaintiff Mansfield, and Shane Smith simultaneously on an unspecified date in the future. Chaplain Gibson advised Pastor Herrell that he could only visit one inmate at a time and that he was only approved on Michael Murphy's visiting list. (DX 8.)

30. On July 27, 2007, defendant Webster issued a conduct violation to plaintiff Dayringer for violating Rules 22.1 (taking property without consent) and 24.1 (making, transferring or having possession of any unauthorized article). (PX 17.)

31. On July 28, 2007, Vann Herrell signed a visiting application form sent to him by plaintiff Mansfield. Pastor Herrell marked the clergy/spiritual advisor box under the section "relationship to offender" and indicated he was on the visiting lists of Michael Murphy and David Tate as a clergy/spiritual advisor. JCCC received this application form on August 3. (DX 9.)

5

32. On August 1, 2007, plaintiff Mansfield was found guilty of the July 26 conduct violation following a disciplinary hearing. On August 6, defendant Galloway approved the sanctions recommended by the disciplinary hearing officer, that is, a ten-day living area and activity restriction, in addition to confiscation of the items removed from Mansfield's cell. (DX 17.)

33. Defendant Galloway reviewed disciplinary actions and recommended sanctions for all minor conduct violations by inmates at JCCC.

34. Plaintiff Dayringer's disciplinary hearing was held August 2, 2007. He was found guilty. On September 10, 2007, defendant Galloway modified the sanctions recommended by the disciplinary hearing officer to be consistent with policy. He defined the contraband that was to be confiscated and allowed plaintiff Dayringer to mail eight books out of the institution by October 14, 2007. (PX 18.)

35. On August 13, 2007, inmate Shane Smith filed an IRR concerning the July 25 search of his cell and resulting conduct violation. In response to that IRR, the Functional Unit Manager decided to return The Septuagint, The Anointed Standard Translation, and The Apocalypse of Jesus Christ only. Defendant Galloway approved the IRR response on August 28. Shane Smith chose to accept the IRR response rather than proceed to the next stage of the grievance process. Shane Smith was allowed to send the remaining books out of the prison by October 21, 2007, and did so. (PX 58.)

36. Shane Smith did not work at the JCCC Handicap Center.

37. Defendant Galloway reviewed responses to IRR's that did not involve medical issues, including the responses to the IRR's of plaintiffs Dayringer and Mansfield.

38. On August 14, 2007, Chaplain Gibson approved Vann Herrell as a clergy visitor on plaintiff Mansfield's visiting list. Defendant Wood signed off on that approval.

39. The Offender Authorized Personal Property Policy, IS 22-1.2, allows an inmate to possess up to six books at one time. (DX 38, attachment H.)

40. Plaintiffs identified The Septuagint, a version of the Old Testament, and The Anointed Standard Translation (AST) as the two "holy texts" of CSCS.

6

41. The Offender Authorized Personal Property Policy does not prevent inmates from possessing any particular book published by Herrell Brothers Publishing House, which prints CSCS books. The policy allows inmates to possess in their cells the "holy texts," plus four books of their choosing at the same time.

42. Plaintiff Mansfield has never owned a copy of the Septuagint.

43. Defendant Webster did not remove plaintiff Mansfield's copies of <u>Strong's Concordance</u> or the <u>Douay-Rheims Bible</u> when he searched plaintiff Mansfield's cell.

44. Plaintiff Mansfield uses the <u>Strong's Concordance</u> to study his faith and write papers.

45. Despite the confiscation of items from his cell, plaintiff Mansfield wrote an article in August 2007 that he submitted to CSCS entitled, "Did Moses Marry a Black African Woman?", utilizing his <u>Douay-Rheims Bible</u>.

46. If an inmate wishes to obtain other books, but has the authorized limit of six in his possession, he can arrange to send excess books out of the institution with a visitor or by mail. (DX 38 at pp.6-7.) After the items are sent out of the institution, the inmate may receive or purchase other items. (DX 38 at p.7.)

47. Plaintiff Mansfield receives visits at JCCC. (DX 4.)

48. Plaintiff Dayringer has also received visits at JCCC. (DXs 5-6.)

49. In response to plaintiff Mansfield's grievance appeal, the July 26, 2007 conduct violation was modified "to a Rule 24.6, Contraband to better correspond to the body of the conduct violation report." The brown folder and its contents were returned to plaintiff Mansfield. He was allowed to choose six books to keep, and to mail any remaining books out of the institution within thirty days. (PX 11.)

50. Plaintiff Mansfield signed a copy of the grievance appeal response stating that the brown folder was returned, along with six books, and that nine books were sent out on a visit on June 20, 2008. (DX 19.)

51. Plaintiff Mansfield has mailed CSCS materials out of JCCC on other occasions.

52. In response to plaintiff Dayringer's grievance appeal, <u>The Hidden Truth</u> was returned to him, the <u>Separatist Brief</u> was confiscated and disposed of due to its altered state, and

Dayringer was allowed thirty days to choose what remaining books to retain up to the authorized limit of six books. (PX 12.)

53. The Hidden Truth plus six books were returned to plaintiff Dayringer on June 20, 2008. (DX 47.)

54. MDOC now allows inmates to receive free books through the mail. (DX 31 at 8-9.) Inmates were not allowed to receive free books through the mail in 2007. (DX 30 at 8, DX 38 at 4.)

55. Plaintiffs were not prohibited from reordering books.

56. Defendant Webster removed the following books from plaintiff Dayringer's cell on July 25, 2007: The Genesis of Evil, The Baptism of Fire (Book 1), The Septuagint v. the Masoretic Text, The Septuagint with Apocrypha, The New Testament AST, The History of the Bible, Christian Separatist Catechism, and The Separatist Brief. Plaintiff Dayringer did not purchase The Genesis of Evil, The Baptism of Fire (Book 1), The Septuagint v. the Masoretic Text, or The Christian Separatist Catechism.

57. Defendant Webster removed the following fourteen books from plaintiff Mansfield's cell on July 18, 2007: The New Testament Anointed Standard Translation, The History of the Bible, The Sixth Law of God, The Baptism of Fire, Water Baptism (Book 2), Water Baptism (Book 1), Christian Separatist Catechism, The Truth Unveiled, The Apocalypse of Jesus Christ, Separatist Brief (Volume 1), Separatist Brief (Volume 2), Separatist Brief (Volume 3), CSC Chronicles (Volume 1) and Martin Luther: Select Quotes Concerning the Jews.

58. Defendant Mansfield admitted that the Christian Separatist Catechism, The Sixth Law of God, The Truth Unveiled, The Apocalypse of Jesus Christ, Separatist Brief (Volume 1), Separatist Brief (Volume 2), and Separatist Brief (Volume 3) are 100 pages or more in length.

59. Plaintiff Mansfield did not purchase Martin Luther: Select Quotes Concerning the Jews or The History of the Bible. He received free CSCS books several times.

60. The prayer habits of plaintiffs Dayringer and Mansfield were not impacted by the July 2007 removal of books from their cells.

61. Before July 2007, plaintiff Mansfield borrowed books from other inmates in order to study the CSCS faith.

62. Plaintiff Dayringer had a borrowed copy of <u>The Masoretic Text v. the Septuagint</u> in his cell when defendant Webster searched it in July 2007.

63. Free bibles were available from the chapel.

64. Rhonda Muenks, a caseworker in the Grievance Unit at the MDOC's Central Office, researched and drafted the responses to plaintiffs' grievance appeals, Grievance Appeal Nos. JCCC 07-1741, JCCC 07-1817, and JCCC 07-2437, that Mike Kemna signed. (PX 11-12.)

65. In order to prepare responses to plaintiffs' grievance appeals, Ms. Muenks requested the books and pamphlets that had been removed from their cells from JCCC and examined those items.

66. In drafting the responses to plaintiffs' grievance appeals, Ms. Muenks consulted her Webster's dictionary. That dictionary defined "pamphlet" as a small printed tract; a booklet. The definition of "booklet" was a book having few pages, and often with no cover.[1]

67. Department policies governing inmate personal property do not recognize a distinction between books and pamphlets. Ms. Muenks considered any item that was more than twenty pages long and bound or stapled to be a book. The items delivered to Ms. Muenks included the books listed in the responses to plaintiffs' Grievance Appeal Nos. JCCC 07-2437 and JCCC 07-1817.

68. Ms. Muenks determined that plaintiffs had violated a prison rule barring contraband.

69. The Offender Property Control Procedures policy, IS 22-1.2 (DX 38-39) and Impound and Confiscation Procedures, SOP 22-1.3 (DX 40) also ban contraband.

---

[1]The Policy and Procedure Manual does not provide adequate definitions of what constitutes a "book" and what constitutes a "pamphlet." Testimony during trial revealed both inmates and prison officials were confused and that prison officials gave inconsistent interpretations of what constitutes a "book" or a "pamphlet." The confusion has resulted in the issuance of conduct violation reports against inmates when the inmates appear to have honestly believed they were following the six-book-limit policy. The rule, as it is currently written, is being applied inconsistently. This is unfair to both inmates and to prison officials attempting to enforce the six-book-limit rule. The Court strongly recommends that MDOC attempt to further clarify the six-book-limit rule and provide a definition of what constitutes a "book" and what constitutes a "pamphlet" in order to reduce confusion in the future.

9

70. All contraband found in the possession of an offender at JCCC "will be disposed of in accordance with IS/SOP 22-1.2 Offender Property Control Procedures."  (DX 40, p.5.)

71. Making, transferring, or possessing dangerous contraband is treated as a major conduct violation.  (DX 32, pp.3-4.)  Other contraband violations are classified under subsections of Rule 24 and are generally treated as minor conduct violations.  (DX 32, pp.3,7.)

72. Dangerous contraband, including razor blades, have been found in books within the Missouri prison system.

73. Inmates at JCCC and other prisons have used razor blades to inflict serious injuries on staff and other inmates.  David Dormire, Director of the Missouri Division of Adult Institutions, testified the most recent homicide to occur within the MDOC system was committed with a razor blade.

74. Mr. Dormire was the Warden of JCCC from its opening in 2004 until he became Director of the Division of Adult Institutions in 2011.  He testified about resource limitations, the time-consuming nature of cell searches, and difficulties that staff faced in searching cells at JCCC.

75. Correctional staff are pulled away from their other duties to search cells.  Due to current staffing levels at JCCC, the frequency of searches is limited.

76. Defendant David Webster testified about the process of searching cells based on his work experience.

77. Altered items are treated as contraband.  (DX 32, p.7.)  An altered item is deemed to be added to or modified from its original condition in an unauthorized manner.  Altered items can pose security risks.

78. Allowing inmates at JCCC to have more than six books and unlimited pamphlets would increase the burdens that staff face in searching cells.  Allowing additional books would require staff to search more items, increasing the time needed to search and the risk that contraband would escape detection.  Limiting the number of books is also done to reduce fire safety concerns.

79. In 2007, plaintiff Mansfield was able to pray the same amount as he did in 2010.

80. Plaintiff Dayringer also prayed the same amount in 2007 and 2008 as he did in 2010.

10

81. Before July 2007, plaintiff Mansfield studied the CSCS faith by borrowing materials from other inmates. He also borrowed bibles from other cellmates and inmates who attended chapel services.

82. According to Director Dormire, the MDOC does not have a policy which prohibits members of the CSCS faith from having their bibles and study materials within their cells as long as the books and materials are within the six-book limit and the books and materials do not advocate violence or contain other inappropriate inflammatory information. Mr. Dormire further testified CSCS inmates are free to practice their faith within the rules of the institution. Mr. Dormire and other MDOC witnesses testified that members of the CSCS faith are permitted to purchase study materials and bibles from CSCS and Herrell Brothers Publishing House (HBPH).

### III. Conclusions of Law

*A. Request for Declaratory Relief.*

Plaintiffs Dayringer and Mansfield seek only declaratory relief, which is a discretionary remedy. Roark v. South Iron R-I Sch. Dist., 573 F.3d 556, 561-62 (8th Cir. 2009). The Declaratory Judgment Act permits a federal court to declare the rights of any interested party when an "actual controversy" exists. Gopher Oil Co. v. Bunker, 84 F.3d 1047, 1050 (8th Cir. 1996). In order to satisfy the actual controversy requirement, there must be "a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. (quoting Caldwell v. Gurley Refining Co., 755 F.2d 645, 649 (8th Cir. 1985)). Whether an actual controversy exists "is made upon the facts on a case by case basis." Marine Equip. Management Co. v. United States, 4 F.3d 643, 646 (8th Cir. 1993). The mootness analysis applies where a plaintiff is seeking only declaratory relief. See Hickman v. State of Missouri, 144 F.3d 1141, 1142 (8th Cir. 1998) (trial court denied injunctive relief due to plaintiffs' release and prison's substantial compliance with ADA, but granted declaratory relief concerning certain facilities and programs; Eighth Circuit reversed grant of declaratory relief).

"Federal jurisdiction is not created by a previously existing dispute." Id. A live controversy is required throughout the course of litigation, not merely when the complaint is filed. Id.; Neighborhood Transp. Network v. Pena, 42 F.3d 1169, 1172 (8th Cir. 1994).

11

Defendant Webster retired on July 31, 2001 (Doc. 117- 1), and defendant Galloway retired on August 31, 2011 (Doc. 123-1). Thus, plaintiffs' claims for declaratory relief against defendants Webster and Galloway, which relate to the July 2007 searches of their cells and disciplinary sanctions for violations of prison rules identified during those searches, are moot.

Plaintiffs' claims against defendant Wood became moot in 2009 when he retired. Regardless, plaintiffs still failed to present sufficient evidence supporting their allegations that defendant Wood directed defendant Webster to search their cells or remove CSCS materials from plaintiffs due to their religious beliefs. To the contrary, the testimony at trial clearly established that defendant Webster searched plaintiffs' cells because he suspected the cells contained contraband. Plaintiffs did not list the prison officials who replaced former Deputy Warden Wood or former Assistant Deputy Warden Galloway on their witness list. Plaintiffs also failed to present evidence that the successors to defendants Wood and Galloway have threatened to confiscate any of their CSCS materials, that those individuals have interfered with plaintiffs' study of CSCS materials, or that defendants' successors have treated plaintiffs differently because of their beliefs. Finally, plaintiffs have failed to establish that there is a system-wide practice by MDOC officials which prohibits inmates from freely practicing their CSCS faith. Inmates practicing the CSCS faith are permitted to purchase bibles and other publications needed to practice their faith. They are permitted to keep these publications within their cells as long as they are compliant with the six-book-limit rule. CSCS religious materials are also available in the prison chapel for use by inmates. They are permitted visits by CSCS clergy. Consequently, they have not overcome the mootness issue.

The Court further finds that the evidence presented at trial does not support plaintiffs' claims that defendants Galloway, Webster and Wood violated plaintiffs' constitutional rights or RLUIPA.

*B. Counts I and II - Plaintiff Mansfield's Retaliation Claims.*

To establish a valid retaliation claim under 42 U.S.C. § 1983, plaintiff Mansfield must prove that he engaged in constitutionally protected activity, and that defendants, to retaliate for the protected activity, took adverse action against Mansfield that would chill a person of ordinary firmness from engaging in that activity. Revels v. Vincent, 382 F.3d 870, 876 (8th Cir. 2004).

12

Plaintiff Mansfield initially claims that defendants Wood and Webster refused to process and approve CSCS Pastor Vann Herrell's application to visit him as a clergy visitor. Evidence reveals defendant Webster did not play any role in the approval or denial of clergy visitor applications. Rather, defendant Wood approved clergy visitor applications after Chaplain Gibson obtained and processed the required clergy visitation forms. Chaplain Gibson wrote to Vann Herrell on July 25, 2007, a week after defendant Webster's search of plaintiff Mansfield's cell, to advise Pastor Herrell that he was not approved on plaintiff Mansfield's visitor list. After Chaplain Gibson sent this letter, defendant Wood promptly reviewed the Chaplain's approval of Vann Herrell's July 28 visiting application form and Pastor Herrell was added to plaintiff Mansfield's list as an approved clergy visitor. Consequently, the evidence does not support plaintiff Mansfield's claim that defendants Webster and Wood refused to process or approve Pastor Vann Herrell's applications to visit plaintiff Mansfield.

Plaintiff Mansfield next contends that defendant Webster removed CSCS materials from his cell in retaliation for his inquiry concerning the status of Pastor Herrell's visitor application form. Plaintiff Mansfield alleges the removal of the books was retaliatory discipline, in violation of his constitutional rights. Plaintiff Mansfield contends he did not violate the prison rule against theft or have more than six books.

Under section 1983, an inmate may maintain a cause of action for retaliatory discipline where a prison official files disciplinary charges in retaliation for the inmate's exercise of his constitutional rights. Hartsfield v. Nichols, 511 F.3d 826, 829 (8th Cir. 2008). However, when the allegedly retaliatory conduct violation is issued for the actual violation of a prison rule, the retaliation claim fails. Id. Where a defendant can show there is "some evidence" the inmate actually violated a prison rule, plaintiff's retaliation claim fails. Id., at 829, 831.

"[T]he relevant question is whether there is any evidence in the record that could support" the violation. Brown v. Frey, 807 F.2d 1407, 1414 (8th Cir. 1986) (quoting Superintendent v. Hill, 472 U.S. 445, 455 (1985)). The results of a correctional officer's investigation meet this standard. Id. at 1414. Statements in a written report of an incident are sufficient to meet the "some evidence" standard. Id. at 1412. A report from a corrections officer, "even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence'" upon which

13

to base the disciplinary violation if the violation is found by an impartial decisionmaker. Hartsfield v. Nichols, 511 F.3d at 830. The subsequent expungement or modification of a conduct violation does not mean there was not "some evidence" for its imposition. Moots v. Lombardi, 453 F.3d 1020, 1023 (8th Cir. 2006).

Plaintiff Mansfield's retaliation claim falls short because there was "some evidence" that he actually violated the prison rules against possession of contraband and possibly of theft.

As to the theft violation, evidence presented demonstrated some of plaintiff Mansfield's books found in his cell had plastic comb binding. Inmates at JCCC were not allowed to have books with plastic comb binding in their cells because of safety concerns. Until April 2007, plaintiff Mansfield worked at the JCCC Handicap Center which uses plastic binding to manufacture Braille books. It was reasonable for defendant Webster to conclude that plaintiff Mansfield had stolen the plastic binding from the JCCC Handicap Center. A letter written by plaintiff Mansfield that was removed during the cell search revealed that he had possibly used a scanner and paper at the JCCC Handicap Center to reformat and print a copy of the Christian Separatist Catechism to send to attorney Jason Henry. The disciplinary hearing officer subsequently found plaintiff guilty of theft.

The books removed by defendant Webster from plaintiff Mansfield's cell were sufficient evidence to show that he had more than six books, in violation of the prison rule barring contraband. Plaintiff Mansfield has admitted that seven of the items were at least 100 pages long. Plaintiffs' arguments that Ms. Muenks, defendant Webster, and the Disciplinary Hearing Officers incorrectly characterized some of their literature as books, while vigorously disputed at trial, are lacking in merit.

C. *Count II—Plaintiff Dayringer's Retaliation Claim.*

Plaintiff Dayringer alleges defendant Webster retaliated against him by searching his cell in response to an IRR filed by plaintiff Mansfield relating to defendant Webster's July 18, 2007 search of plaintiff Mansfield's cell. In order to establish a section 1983 retaliation claim, plaintiff Dayringer must first prove that he engaged in constitutionally protected activity. Revels, 382 F.3d at 876. Plaintiff Dayringer cannot establish a retaliation claim based on plaintiff Mansfield's protected activity of filing an IRR concerning the July 18 search of his cell.

14

First, plaintiffs' cells were not located in the same housing unit. Plaintiff Dayringer has not alleged that defendant Webster searched his cell because of his association with plaintiff Mansfield. Even if he had, acquaintance with an inmate in a separate housing unit of a maximum security prison is not a relationship that entitles plaintiff Dayringer to bring a retaliation claim. See Thompson v. North Amer. Stainless, L.P., ___ U.S. ___, ___, 131 S. Ct. 863, 868 (2011).

Second, to the extent that plaintiff Dayringer seeks to challenge the conduct violation that defendant Webster issued to him as retaliatory discipline, his claim still fails. With respect to the theft violation, plaintiff Dayringer did not purchase several books that defendant Webster removed when he searched his cell. Inmates were not allowed to receive free books in July 2007. Thus, prison officials would have been unable to verify that all of the books in plaintiff Dayringer's possession were his property. The books that were removed from plaintiff Dayringer's cell were sufficient evidence to show he had more than six books, in violation of a prison rule barring contraband. Plaintiff Dayringer cannot prevail on his retaliation claim because the disciplinary hearing officer who considered the merits of the theft violation found plaintiff guilty, and there was "some evidence" to support the conduct violation. Hartsfield v. Nichols, 511 F.3d at 830-31.

*D. Count III - Equal Protection Claim.*

A plaintiff bringing an equal protection claim must prove that he was "treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest." Murphy v. Missouri Dept. of Corr., 372 F.3d 979, 984 (8th Cir. 2004). Plaintiffs must prove they were treated differently than other persons who were "in all respects similarly situated." Flowers v. City of Minneapolis, 558 F.3d 794, 798 (8th Cir. 2009). Plaintiffs Dayringer and Mansfield have not made the required showing.

Inmate Shane Smith, who identified himself as a member of CSCS, also had CSCS books removed from his cell when defendant Webster conducted a search and discovered that Smith had excess books, in violation of the six-book limit. Mr. Smith, like plaintiffs, was found guilty of violating a prison rule against theft and was also charged with contraband violations. Like

15

plaintiffs, the books removed from Smith's cell were also confiscated as a result of a disciplinary sanction. Although three of the books were returned to Mr. Smith following the first stage of the grievance process, he was not treated more favorably than plaintiffs. Once the grievance process was completed, plaintiffs were allowed to select six of the books that were removed from their cells to be returned. In addition, their conduct violations were modified from theft and contraband violation to simply contraband violations.

*E. Count IV - Plaintiffs' RLUIPA Claims*

The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000, prohibits the government from substantially burdening an inmate's religious exercise absent a compelling interest. Plaintiffs claim that their rights under RLUIPA were violated when defendant Webster removed CSCS materials from their cells. Plaintiffs allege defendant Galloway's failure to return their books to them after they were found guilty of conduct violations for theft also violated RLUIPA. Plaintiffs also challenge the six-book-limit policy under RLUIPA.

To constitute a "substantial burden," under RLUIPA, government actions "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs," "meaningfully curtail" ability to express adherence to his faith, or "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." Gladson v. Iowa Dept. of Corr., 551 F.3d 825, 832 (8th Cir. 2009).

Although the level of scrutiny under RLUIPA is more strict than the Turner analysis, "prison officials must nevertheless be accorded some deference in evaluating whether they have met their burden." 2007 WL 1116045 at * 3 (E.D. Ark. Apr. 12, 2007). RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter v. Wilkinson, 544 U.S. 709, 722 (2005). "We do not interpret RLUIPA to prevent a prison from applying certain important security regulations to all inmates without providing for exemptions." Fegans v. Norris, 537 F.3d 897, 907 (8th Cir. 2008). RLUIPA should be applied "in an appropriately balanced way, with particular sensitivity to security concerns." Cutter, 544 U.S. at 722.

16

Plaintiffs have not satisfactorily demonstrated that the actions of defendants Galloway and Webster have substantially burdened their ability to exercise their CSCS religion. Defendant Webster's removal of religious books and pamphlets during the July 2007 searches of their cells and the fact that defendant Galloway did not immediately order those items returned do not constitute actions which the Court believes substantially burdened plaintiffs' religious exercise. Defendants have adequately demonstrated they were simply enforcing a written prison policy restricting the number of books an inmate can have in a cell. The policy had been enacted for purposes of institutional safety and security. RLUIPA does not elevate the accommodation of plaintiffs' study of CSCS materials above prison officials' need to maintain order and safety by enforcing prison rules such as rules against theft and possession of contraband. Cutter, 544 U.S. at 722.

Plaintiffs Dayringer and Mansfield had each received free CSCS literature, including books, through the mail. Both plaintiffs had borrowed CSCS books from other inmates. Despite the confiscation of his books in August 2007, plaintiff Mansfield was able to write an article that he submitted to CSCS. Plaintiff Mansfield authored, "Did Moses Marry a Black African Woman?", using his Douay-Rheims Bible. Plaintiffs were also able to purchase other CSCS books through the mail. They were still able to engage in other religious practices, including prayer and living according to their beliefs, even after defendant Webster searched their cells and removed their books. Under the facts of this case, plaintiffs have not met their burden. The foregoing facts clearly demonstrate plaintiffs were able to exercise their religious beliefs. The Court finds defendants Galloway and Webster did not violate plaintiffs' rights under the RLUIPA.

With respect to plaintiffs' challenge to the six-book-limit policy, the Offender Authorized Personal Property Policy, IS 22-1.2, allows an inmate to possess up to six books at one time. (DX 38, attachment H.) The Court finds the policy does not impose a substantial burden upon plaintiffs' study of their CSCS beliefs. The policy allows plaintiffs to each possess two holy texts plus four other books at all times. Plaintiffs are able to obtain other literature by choosing one or more books to send out with a visitor, mail out of the institution, or present to the property room for disposal. Once those books are mailed out of the institution, plaintiffs may receive

Case 2:08-cv-04128-MJW   Document 174   Filed 02/24/12   Page 17 of 22

other items. In addition, MDOC policy now allows inmates to receive free books through the mail in addition to purchasing books from outside sources.

Plaintiffs have been and are still afforded reasonable opportunities to study their religious beliefs. See Sanders v. Ryan, 484 F. Supp. 2d 1028, 1034-35 (D. Ariz. 2007) (limit of ten audiotapes of worship services not a substantial burden where inmate could obtain additional tapes by disposing of other tapes), 316 Fed. Appx. 610, 611 (9th Cir. 2009) (aff'g grant of summary judgment on RLUIPA claim). Enforcing the six-book-limit policy does not meaningfully curtail plaintiffs' ability to express adherence to CSCS. See McNeal v. Martin, No. 4:05CV312, 2005 WL 3079026 at *1, *3 (E.D. Mo. Nov. 16, 2005) (policy allowing one book did not violate RLUIPA). The Court finds plaintiffs have not met their burden of proof under RLUIPA.

The Court does not find declaratory relief with respect to the Department of Corrections' Offender Authorized Property Policy is appropriate. Several MDOC witnesses testified that dangerous contraband, including razor blades, have been found concealed in books. The Court finds it is a better practice to defer to prison officials' judgment in addressing this very real threat to safety and institutional security. The Court also finds that increasing the number of books inmates are allowed to possess would unnecessarily place additional burdens on correctional staff. The restrictions that existing policy places upon an inmate's ownership of books do not warrant court intervention in light of MDOC's legitimate security concerns. See Singson v. Norris, 553 F.3d 660, 662-63 (8th Cir. 2009).

*F. Count V - Plaintiffs' First Amendment Claims.*

Plaintiffs next claim that the removal of CSCS literature from their cells substantially burdened their right to the free exercise of their religion. However, the Supreme Court has ruled that the First Amendment permits reasonable restrictions on the religious practices of incarcerated persons. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). "Prison regulations may infringe upon prisoners' constitutional rights so long as such regulations are reasonably related to legitimate penological interests." Goff v. Graves, 362 F.3d 543, 549 (8th Cir. 2004) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). The four-part test of Turner is

Case 2:08-cv-04128-MJW   Document 174   Filed 02/24/12   Page 18 of 22

intended to balance inmates' First Amendment right to free exercise of religion with valid penological interests. O'Lone at 348-49.

The factors considered for determining the reasonableness of the policy limiting inmates to six personal books at one time are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest used to justify it; (2) whether there exist alternate means for prisoners to exercise the constitutional right at issue; (3) the impact that would be caused by accommodation of the right on prison staff, inmates, and allocation of prison resources; and (4) whether any alternative exists that would fully accommodate the prisoner's rights at de minimis cost to valid penological interests. Turner, 482 U.S. at 89-91; Hamilton v. Schriro, 74 F.3d 1545, 1550 (8th Cir. 1996).

Applying the Turner factors to the case at hand, first, attempts to minimize the number of books inmates may possess rationally advances MDOC's safety and security concerns by limiting potential hiding places for dangerous contraband. MDOC has a valid penological interest in controlling contraband. Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998). The book limit also furthers safety and security interests by reducing the risk that contraband will be missed during cell searches and conserves limited staff resources. Restricting the number of books an inmate can have in a cell also advances institutional fire safety concerns.

The second factor of the Turner analysis is "whether there are alternative means of exercising the constitutional right that remain open to prison inmates." Turner, 482 U.S. at 90. Where other avenues remain available, the court should ordinarily defer to the expert judgment of prison officials. Id.; Pell v. Procunier, 417 U.S. 817, 827 (1974). As previously discussed when addressing plaintiffs' RLUIPA claims, plaintiffs had opportunities to purchase CSCS books and to possess up to six books—all of which could be CSCS literature—at a time. Plaintiffs also had opportunities to practice their beliefs through prayer and the manner in which they conducted themselves in their daily lives.

The third Turner factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90. Under Turner, where an inmate's exercise of a constitutional right adversely affects the rights and safety of correctional officers and other inmates, corrections

19

officials' decision to limit that right "should not be lightly set aside by the courts." 482 U.S. 92-93. Declaring actions to enforce prison rules against theft or contraband invalid would clearly have an adverse impact on prison staff and inmates. Invalidating or changing a rule limiting the number of personal books an inmate may possess at one time in a cell would adversely affect order and safety within MDOC correctional facilities.

Fourth, plaintiffs have not shown that an alternative existed that fully accommodated their rights at a de minimis cost to valid penological interests. Turner, 482 U.S. at 90-91.

### IV. Systemwide Violation of Inmates' Freedom to Practice Their Faith and Mootness Issue

On September 7, 2011, prior to trial, the Court entered an order granting plaintiffs' leave to amend their complaint to (1) add MDOC as a defendant; and (2) clarify their claims to include a constitutional challenge to the policy of MDOC limiting the number of books inmates can have in their cells. (Doc. 124.) The Court granted plaintiffs leave so they could add MDOC as a defendant because the three individual defendants, Galloway, Webster and Wood, had retired. The Court did so in order to allow plaintiffs to proceed so a decision could be reached on the merits of their claims. When the Court granted the plaintiffs leave to amend, the Court also denied defendants' motions to dismiss. In the motion to dismiss, defendants asserted that the retirement of the individual defendants made plaintiffs' claims moot. The Honorable Scott O. Wright had previously entered an order denying defendants' summary judgment motion which also included the same mootness argument.

The parties agreed that Tara v. Trimble, 622 F2d 400 (8ᵗʰ Cir. 1980), is controlling on this issue. Although the plaintiffs here did not properly amend their complaint prior to trial, the Court, as a matter of fairness to the plaintiffs who were proceeding *pro se*, permitted plaintiffs to present evidence which they contended would demonstrate there was a systemwide practice within MDOC to deny inmates the right to exercise their CSCS faith. Plaintiffs were required to show a substantial likelihood that declaratory relief awarded against MDOC would remedy their alleged injuries in order to overcome the mootness defense. See McConnell v. Fed. Elec. Comm'n, 540 U.S. 93, 225 (2003), overruled, in part, on other grounds, Citizens United v. Fed. Elec. Comm'n, 130 S. Ct. 876, 913 (2010). Plaintiffs have not met their burden.

20

Defendants Galloway, Webster, and Wood denied any of their actions in removing the books from plaintiffs' cells and keeping them in the property room for an extended period during the grievance process were motivated by a desire to deny plaintiffs the right to exercise their CSCS faith. The Court finds their testimony credible. There were also additional MDOC witnesses who testified during the trial that inmates practicing the CSCS faith were permitted to freely exercise their religion. Finally, David Dormire, Director of MDOC, testified there was no systemwide practice in Missouri prisons preventing inmates from practicing the CSCS faith. The Court finds that Director Dormire's testimony is highly credible. Consequently, plaintiffs have not overcome the mootness defense and their claim that there is system-wide practice to deny inmates within the MDOC the right to exercise the CSCS faith fails.

## V. Conclusion

The Court find that the Offender Authorized Personal Property Policy's limit of six books does not impose a substantial burden on plaintiffs' religious exercise and that the policy is the least restrictive means of furthering the MDOC's compelling penological interest in safety and security.

The Court also finds that the actions of defendants Webster, Wood, and Galloway in enforcing prison rules were not motivated by Vann Herrell's request for approval to visit plaintiff Mansfield or by plaintiff Mansfield's filing of an Informal Resolution Request following the July 18, 2007 search of his cell. The Court finds that defendants did not retaliate against plaintiffs for exercising their religious rights.

The Court finds plaintiffs were not treated differently than other inmates, including inmate Shane Smith, because of their exercise of the CSCS faith. Thus, the requirements for a valid equal protection claim have not been met.

The Court further finds the plaintiffs' claims under RLUIPA challenging the six-book limit, the removal of books from their cells, and the delay in returning the books to plaintiffs, do not constitute valid claims under RLUIPA and their claims under RLUIPA also fail.

The Court finds that plaintiffs' First Amendment rights to practice freely their CSCS faith have not been violated under the requirements as set forth in <u>Turner</u>.

Finally, the Court finds that MDOC officials have not engaged in a system-wide practice or policy of violating the constitutional rights of plaintiffs and other inmates who practice the CSCS faith by denying them access to their religious books and materials or denying them the ability to practice their faith.

The Court concludes, based upon the relevant legal authorities and evidence presented, that defendants are entitled to judgment in their favor on all claims.

IT IS, THEREFORE, ORDERED that plaintiffs' requests for declaratory relief are denied. It is further

ORDERED that plaintiffs' claims are dismissed, with prejudice.

Dated this 24th day of February, 2012, at Jefferson City, Missouri.

/s/ *Matt J. Whitworth*

MATT J. WHITWORTH
United States Magistrate Judge

22